# Exhibit A



125 Broad St. 19 Floor
New York, NY 10004
P 212.607.3300
F 212.607.3318
www.nyclu.org

Paige Austin
Staff Attorney
212.607.3398
paustin@nyclu.org

July 24, 2018

United States Immigration & Customs Enforcement (ICE)
Freedom of Information Act Office
500 12th Street, SW, Stop 5009
Washington, D.C. 20536-5009
E-mail: ice-foia@dhs.gov

VIA ELECTRONIC MAIL

*Re: Freedom of Information Act Request / Expedited Processing Requested*

To Whom It May Concern:

The New York Civil Liberties Union ("NYCLU"), the New York affiliate of the American Civil Liberties Union, submits this Freedom of Information Act ("FOIA") request pursuant to 5 U.S.C. § 552 *et seq.*, and the relevant implementing regulations, 6 C.F.R. § 5 *et seq.* The NYCLU seeks records pertaining to initial custody determinations by U.S. Immigration and Customs Enforcement ("ICE") Office of Enforcement and Removal Operations ("ERO").

### I.     Background

In the past year, the process by which the government has determined whether to detain or release non-U.S. citizens pending their removal proceedings appears to have changed dramatically. Most non-U.S. citizens whom ICE detains in the interior of the U.S. and who do not have criminal convictions triggering mandatory detention, *see* 8 U.S.C. § 1226(c), are eligible to be released from custody during the pendency of their removal proceedings. 8 U.S.C. § 1226(a). ICE officers are required to make a custody determination within 48 hours of detaining a non-U.S. citizen. 8 C.F.R. § 287.3(d); *see also* 8 C.F.R. § 1236.1(c)(8) (permitting release of an alien who poses no flight risk or danger). These officers can decide whether to release a person on his or her own recognizance, set a monetary bond, or detain without bond. Individuals who are not released remain incarcerated for weeks or months until their first appearance before an immigration judge, which is the next opportunity to seek release from custody. 8 C.F.R. § 1003.19(a).

Because it can mean the difference between prompt release and months of detention, the initial custody determination has enormous impact. The determination affects not only the

individual who faces possible detention but also his or her family, livelihood, and prospects for obtaining legal relief. *See Abdi v. Duke*, 280 F. Supp. 3d 373, 407–08 (W.D.N.Y. 2017) (finding irreparable harm results from ICE's denial of timely release from custody on parole), *order clarified sub nom. Abdi v. Nielsen*, 287 F. Supp. 3d 327 (W.D.N.Y. 2018), *appeal docketed*, No. 18-94 (2d Cir. Jan. 11, 2018).

ICE's policy with respect to initial bond determinations has reportedly undergone significant changes in the past year, with many fewer people now having bond set after their arrest.[1] This may be in part due to changes in how ICE assesses risk. In 2013, ICE developed a computer-based Risk Classification Assessment Tool to assist in initial release and custody determinations.[2] The tool requires that ICE ERO officers ask dozens of question of a newly detained non-citizen, a process that can take 30 minutes or more. *Id.* At the conclusion of these questions, the program recommends whether the person should be detained or released upon payment of a bond—a recommendation that the officer can then accept or override. According to a news report last month, at some point in 2017:

> ICE modified a tool officers have been using since 2013 when deciding whether an immigrant should be detained or released on bond. The computer-based Risk Classification Assessment uses statistics to determine an immigrant's flight risk and danger to society. Previously, the tool automatically recommended either "detain" or "release." Last year, ICE spokesman Bourke said, the agency removed the "release" recommendation, but he noted that ICE personnel can override it. The impact of these changes was immediate. The number of immigrants with no criminal history that ICE booked into detention tripled to more than 43,000 in 2017 from a year earlier, according to agency data.[3]

The changes in ICE ERO's initial custody determination procedures have not been made public and have left civil rights and immigration organizations, like the NYCLU, unsure of how to inform the public and advise potentially impacted individuals. These changes also raise significant concerns around whether ICE ERO's policies and practices in initial custody determinations comport with applicable laws, regulations, and constitutional requirements.

---

[1] Mica Rosenberg & Reade Levinson, *Trump's Catch-and-Detain Policy Snares Many Who Have Long Called U.S. Home*, REUTERS, June 20, 2018, https://www.reuters.com/investigates/special-report/usa-immigration-court/ ("In earlier years, ICE would have released many of these people on bond soon after their arrest, allowing them to live with their families while awaiting legal proceedings that can take years. Now, ICE is denying bond for many of those people and pushing to keep them in detention for the duration of their cases, Reuters found, based on an analysis of government data and dozens of interviews with immigration judges, lawyers and current and former officials.")

[2] Office of Inspector General, *U.S. Immigration and Customs Enforcement's Alternatives to Detention*, Feb. 4, 2015, at 11-13, https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf.

[3] Rosenberg & Levinson, *Trump's Catch-and-Detain Policy Snares Many Who Have Long Called U.S. Home*, *supra* at n. 1.

## II.     Requested Records

1. All policies, guidance, advisories, directives, screening tools, or memoranda issued from 2012 to the present and describing or delineating how ICE employees make or are to make custody determinations after the arrest, detention, or encounter of aliens;

2. For the computer-based Risk Classification Assessment tool/s used by ICE in initial custody determinations, documents sufficient to identify the following information, from 2012 to the present:
    a. All questions and data fields;
    b. All answers or responses, where possible answers or responses are provided;
    c. The weight assigned to all possible answers thereto;
    d. All possible outcomes from use of the tool;
    e. Any communications between any representative of ICE and any representative of any vendor offering any Risk Classification Assessment tools;
    f. Any internal communications between representatives or employees of ICE relating to any Risk Classification Assessment tool;
    g. Any policies and practices regarding the use of such tool;
    h. Any manuals, training or guidance documents regarding the use of such tool;
    i. Any documents and records pertaining to changes and/or updates in the Risk Classification Assessment tool since January 2016;
    j. Restrictions on when, where, how, and against whom it may be used;
    k. Any policies and practices regarding the ownership, sharing, and retention period of collected data and information procured through the Risk Classification Assessment tool.

3. Full text of any chapter in the Field Policy Manual or Special Agents Field Manual issued from 2008 to the present and pertaining to custody determinations or detention and bond determinations;

4. Records sufficient to determine, for each month since January 1, 2012, and for each ICE Field Office nationwide, the following: (1) the number of people detained or issued a Notice to Appear; (2) of those detained or issued a Notice to Appear, the number of people released on recognizance or granted an administrative bond and the date; (3) of those granted an administrative bond, the amount of each bond; and (4) of those granted an administrative bond, the number released from ICE custody on the bond, the date of their detention, and the date of their release.

5. Records sufficient to identify, for each initial custody determination made for aliens detained or issued a Notice to Appear by ICE ERO <u>New York</u> and <u>Buffalo</u> Field Offices since January 1, 2012, (1) which ICE ERO field office; (2) the gender and nationality of the person assessed; (3) whether the Risk Classification Assessment tool was used; (4) the score on the Risk Classification Assessment tool with respect to risk to public safety; (5) the score on the Risk Classification Assessment tool with respect to risk of flight; (6) the Risk Classification Assessment decision type; (7) the recommendation from the Risk

Classification Assessment tool, concerning both release and bond amount; (8) whether the ICE officer agreed, and an identifier for the ICE officer; (9) whether the supervisor agreed, and the an identifier for the supervisor, (10) whether bond was set and the dollar amount of bond set, if any.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the NYCLU requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, the NYCLU requests that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

### III.     Application for Expedited Processing

The NYCLU requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

The NYCLU is "primarily engaged in disseminating information" within the meaning of the statute. Obtaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and public are critical and substantial components of the NYCLU's work and are among its primary activities. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (ordering expedited processing where information dissemination is an "activity of the requestor" even if not its "sole occupation"); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing for an organization that "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by the Department of Justice").

The NYCLU's website, social media, and email list serves reach hundreds of thousands of people a month, and its biannual newsletter is distributed in hard copy to approximately 135,000 people. In addition to these regular channels of sharing information, the NYCLU regularly publishes and disseminates reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA and state-law Freedom of Information Law (FOIL) requests.[4] This material is broadly circulated to the public and widely available for no cost.

---

[4] *See, e.g.*, *Presumed Innocent for a Price: The Impact of Cash Bail Across Eight New York Counties* (2018), NYCLU, March 13, 2018, https://www.nyclu.org/en/node/5258 ("To better understand the impact of bail practices in New York, in 2015 the New York Civil Liberties Union sent Freedom of Information Law requests to a sample of eight small, medium and large counties across the state asking for five years of data. The information we received offers a stark glimpse into what New Yorkers have had to endure."); *Taking Cover: How New York Police Departments Resist Transparency* (2017), NYCLU, Sep. 18, 2017, https://www.nyclu.org/en/publications/taking-cover-how-new-york-police-departments-resist-

NYCLU attorneys are also frequently interviewed for news stories, including about documents released through NYCLU FOIA and FOIL requests.[5]

---

transparency-2017 (detailing 23 New York police departments' responses to Freedom of Information Law requests for information about their use of force, stops and detentions, complaints about alleged misconduct, racial profiling and the use of surveillance technologies); *NYPD Has Used Stingrays More Than 1,000 Times Since 2008*, NYCLU, Feb. 11, 2016, https://www.nyclu.org/en/press-releases/nypd-has-used-stingrays-more-1000-times-2008 (posting documents obtained through FOIL and stating "in response to an NYCLU FOIL request, the NYPD disclosed it used Stingrays nearly 1,016 times between 2008 and May of 2015 without a written policy and following a practice of obtaining only lower-level court orders rather than warrants"); *Stop-and-Frisk Data*, NYCLU, Feb. 11, 2016, https://www.nyclu.org/en/stop-and-frisk-data (summarizing data from the New York Police Department on the number and race of New Yorkers stopped and frisked each year since 2002); *Automatic License Plate Readers*, NYCLU, https://www.nyclu.org/en/automatic-license-plate-readers (posting documents obtained through FOIL and stating, "Between 2012 and 2014, the NYCLU sent FOIL requests about automatic license plate readers to the Division of Criminal Justice Services, the NYPD and more than 70 local government entities around New York State, as part of a nationwide effort coordinated by the ACLU to learn more about the use of these devices."); *E-ZPass Readers*, NYCLU, https://www.nyclu.org/en/e-zpass-readers (posting documents obtained through FOIL and stating "In 2014, the NYCLU sent FOIL requests about E-ZPass readers to the New York City Department of Transportation, New York State Department of Transportation, New York State Thruway Authority and NYPD."); *Report: Boxed In: The True Cost of Extreme Isolation in New York's Prisons* (2012), NYCLU, Oct. 2, 2012, https://www.nyclu.org/en/publications/report-boxed-true-cost-extreme-isolation-new-yorks-prisons-2012  ("This report [] is the product of an intensive, year-long investigation… The authors interviewed prisoners' family members and corrections staff, and analyzed thousands of pages of Department of Corrections and Community Supervision (DOCCS) records obtained through the state's open records laws."); *Report: Justice Derailed: What Raids on Trains and Buses Reveal about Border Patrol's Interior Enforcement Practices* (2011), NYCLU, Nov. 9, 2011, https://www.nyclu.org/en/publications/report-justice-derailed-what-raids-trains-and-buses-reveal-about-border-patrols (reporting and analyzing the results of a FOIA request for all transportation arrests by Customs and Border Patrol in Rochester Station over three years); *Report: Education Interrupted: The Growing Use of Suspensions in New York City's Public Schools* (2011), NYCLU, Jan. 25, 2011, https://www.nyclu.org/sites/default/files/publications/Suspension_Report_FINAL_noSpreads.pdf ("Suspension data for this report was provided by the DOE in response to Freedom of Information Law (FOIL) requests filed by the Student Safety Coalition in 2008 and 2009. The records provided by the DOE include comprehensive suspension data corresponding to each school year from 1999-2000 through 2008-2009.")

[5] *See, e.g., NYCLU Reviews Transparency in Police Forces*, SPECTRUM NEWS, Sep. 21, 2017, http://spectrumlocalnews.com/nys/capital-region/capital-tonight-interviews/2017/09/22/donna-lieberman-092117 (interview with NYCLU's executive director on the responses of 23 police departments across New York State to FOIL requests); Janus Kopfstein, *Rochester Police Used A $200,000 Stingray To Track Gang Members*, VICE NEWS, May 18, 2016, https://motherboard.vice.com/en_us/article/mg77gn/rochester-police-are-using-a-200000-

The NYCLU also publishes information for use by impacted individuals, attorneys, and the public including "know your rights" materials, fact sheets, and educational brochures and pamphlets about civil liberties issues and government policies that implicate civil rights and liberties.[6] Finally, the NYCLU offers "know your rights" presentations to community groups and non-profit organizations upon request.[7]

The NYCLU plans to analyze, publish, and disseminate to the public the information gathered through this request. The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed through this request to the public at no cost.

These records are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Whether a requestor demonstrates urgent need to inform the public turns in part on "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001). Here, the means by which ICE conducts initial custody determinations affect thousands of individuals

---

stingray-to-track-gang-member-ny-rochester ("On Wednesday, the New York Civil Liberties Union posted documents showing that since 2011, police in Rochester, New York have spent at least $200,600 on a KingFish, a class of Stingray device [also called cell-site simulators] which allows cops to track thousands of phones and even intercept text messages by pretending to be a nearby cellphone tower"); *New York Police Are Using Covert Cellphone Trackers, Civil Liberties Group Says*, N.Y. TIMES, Feb. 11, 2016, https://www.nytimes.com/2016/02/12/nyregion/new-york-police-dept-cellphone-tracking-stingrays.html (quoting a NYCLU attorney who received documents through FOIL and told The New York Times, "[t]he N.Y.P.D. has been using StingRays since 2008, and yet this is the first time that the public is learning this information"); Kim Zetter, *NY Cops Used 'Stingray' Spy Tool 46 Times Without Warrant*, WIRED, April 7, 2015, https://www.wired.com/2015/04/ny-cops-used-stingray-spy-tool-46-times-without-warrant/ (quoting NYCLU's Western Region chapter director and reporting "The records [from Erie County Police], which the NYCLU published in a blog post today, also show that the county sheriff's office signed a stringent gag order with the FBI to maintain secrecy about their stingray records").

[6] KNOW YOUR RIGHTS, https://www.nyclu.org/en/know-your-rights (linking to "know your rights" materials on a wide array of topics including immigration); NYCLU & Immigrant Defense Project, *New York Practice Advisory: When Does Fingerprinting Put Your Client At Risk With ICE?* July 27, 2017, https://www.immigrantdefenseproject.org/wp-content/uploads/DCJS-advisory-7-27-17-6-PM-updated1.pdf (providing answers to common questions about "when a submission of fingerprints to the New York State Division of Criminal Justice Services (DCJS) can put… noncitizen clients at increased risk of arrest and deportation by U.S. Immigration and Customs Enforcement (ICE)").

[7] KNOW YOUR RIGHTS, https://www.nyclu.org/en/know-your-rights (permitting the public to request a workshop).

encountered and detained as part of immigration enforcement efforts each year. Indeed, Reuters reported last month that "the number of immigrants with no criminal history that ICE booked into detention tripled to more than 43,000 in 2017 from a year earlier."[8] The computer-based program underlying these initial custody determinations recently changed, with the option for "release" being eliminated.[9] This change, and the procedures and policies underlying initial custody determination procedures more broadly, are the subject of intense public interest and debate.[10]

This request warrants expedited processing in light of this significant interest and importance to the public. *See Al-Fayed*, 254 F.3d. at 308 ("whether an issue is the subject of current news coverage" may be relevant to urgency of requestor's need to inform the public); *Protect Democracy Project, Inc. v. U.S. Dep't of Defense*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) ("[O]ne need look no further than the widespread media attention" to find "strong evidence of an 'urgency to inform' the public."); *Wadleton v. Dep't of State*, 941 F. Supp. 2d 120, 123 (D.D.C. 2013) (noting that courts have found an urgent need "when the subject matter of the request was central to a pressing issue of the day").

### IV. Application for Waiver or Limitation of Fees

The NYCLU requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Disclosure of the records sought herein is in the public interest. The records will further public understanding of government conduct. The records are not requested for commercial use.

The NYCLU also requests a waiver of search fees on the grounds that the NYCLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The NYCLU meets the statutory definition of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.*; *see also Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) ("A representative of the news media is, in essence, a

---

[8] Rosenberg & Levinson, *Trump's Catch-and-Detain Policy Snares Many Who Have Long Called U.S. Home*, *supra* at n. 1.

[9] Daniel Oberhaus, *ICE Modified Its 'Risk Assessment' Software So It Automatically Recommends Detention*, VICE NEWS, June 26, 2018, https://motherboard.vice.com/en_us/article/evk3kw/ice-modified-its-risk-assessment-software-so-it-automatically-recommends-detention.

[10] *See, e.g.*, White House, *Statement from the Press Secretary Regarding 'Catch and Release'*, April 6, 2018, https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-catch-release/; National Immigrant Justice Center, *NIJC Condemns Jailing of Arriving Immigrants and Refugees*, April 7, 2018, https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-catch-release/.

person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."); *Liberman v. U.S. Dep't of Transp.*, 227 F. Supp. 3d 1, 10–12 (D.D.C. 2016) (considering an organization's "past, present, and future work" to conclude that organization is a "representative of the news media" and noting that the organization's "audience need not be demonstrably large" and that "merely assembling an organizing entire sets of documents" may suffice); *Cause of Action v. Federal Trade Comm'n*, 799 F.3d 1108, 1119 (D.C. Cir. 2015) (noting that "representative of the news media" should be construed "broadly"); *EPIC v. Dep't of Def.*, 241 F. Supp. 2d 5, 12 (D.D.C. 2003) ("Labels and titles alone, therefore, do not govern; the organization's substantive activities control."). The NYCLU publishes newsletters, know-your-rights materials, blog posts, and other education and information materials that are broadly circulated to the public.[11] Such material is available to everyone, including not-for-profit groups and impacted individuals, at no cost. The NYCLU also makes information available without charge through its website. *See EPIC v. Dep't of Def.*, 241 F. Supp. 2d at 10-15 (disseminating a newsletter via email suffices to show that an organization is a "publisher of a periodical, and therefore falls within [the] definition of a representative of the news media"); *Liberman*, 227 F. Supp. 3d at 12 ("[I]t is now well-established that online means of distribution can satisfy the statutory requirement that a requester 'distribute [its] work to an audience.'") (internal citations omitted).

\* \* \*

Pursuant to applicable statutes and regulations, the NYCLU expects a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii); 6 C.F.R. § 5.5(e)(4). We further expect your reply to the Request itself within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(i).

If the Request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to the FOIA. We also ask that you release all segregable portions of otherwise exempt material.

Please furnish all responsive records to:

Paige Austin
The New York Civil Liberties Union
125 Broad St. 19th Floor.
New York, NY 10004
paustin@nyclu.org
212-607-3398

---

[11] *See, e.g., supra* at nn. 4-6.

Sincerely,

Paige Austin